No. 19,181.

NORA JINKIAWAY et al., *Appellants,* v. BERTHA AR-
DELLA FORD et al., *Appellees,* and ELLA E. ASHLAY
et al., *Appellants.*

### SYLLABUS BY THE COURT.

1. TAXATION—*Duty of Life Tenant to Pay Taxes.* It is the
duty of a tenant for life in possession, and enjoying the
rents and profits of land, to pay the taxes thereon.

2. SAME—*When Remainderman May Purchase Tax Title.* A
remainderman not in possession and having no right to the
occupancy or use of the land may purchase and hold a tax
title thereon under a sale for delinquent taxes which the life
tenant ought to have paid.

3. SAME—*Tax Title—Quitclaim Deed—No Merger.* Where a
remainderman purchases a tax title in the circumstances
above stated, and enters into possession under it, and after-
wards takes a quitclaim deed from the life tenant, the tax
title is not necessarily merged in the conveyance of the life
estate.

4. SAME—*Tax Deed Held by Remainderman—Not for Benefit
of Coremaindermen.* One of several remaindermen, who does
not have the possession, or right of possession, or right to
rents and profits, who purchases the property at a sale for
taxes which the life tenant ought to have paid, to whom a
tax deed, valid on its face is issued, may hold the tax title for
his own use and benefit as against other remaindermen.

Appeal from Clay district court; SAM KIMBLE, judge.
Opinion filed January 9, 1915. Affirmed.

*C. Vincent Jones, F. L. Williams,* and *James L.
Hogin,* all of Clay Center, for the appellants.

*F. B. Dawes,* and *R. C. Miller,* both of Clay Center,
for the appellees.

The opinion of the court was delivered by

BENSON, J.: This is an action to set aside a tax deed,
and also to set aside a quitclaim deed made by the
plaintiff, Nora Jinkiaway, to the defendant, Bertha Ar-
della Ford.

John Ertz, owner of the land in controversy, died February 1, 1897, leaving a will by which he devised to his wife, Nora, for the use of herself and her children, an estate for life in this land. He left five children by a former wife, and seven children by his wife Nora. His will provided that after the death of his wife the home farm in Clay county, now the subject of this action, should be sold and the proceeds divided equally among eleven of his sons and daughters. Five of the children are joined with the widow (now Mrs. Jinkiaway) as plaintiffs, and seven are defendants.

Mrs. Ertz lived on the home farm for about one year after her husband's death, when she leased it for a term of eight years for a grain rent and moved to Clay Center. From Clay Center she moved to Oklahoma, and thence to Wichita, where she has lived since November, 1899. The taxes on the land for the year 1897 were not paid, and it was accordingly sold in September, 1898, to Bertha Ertz, who is a defendant in this action by the name of Bertha Ardella Ford. The taxes for the years 1898, 1899 and 1900 were paid by the purchaser, and a tax deed valid in form was issued to her on September 7, 1901. On September 9, Mrs. Ford presented her tax deed to the subtenant, Mr. Dicks, who was in possession of the farm, holding under the tenant to whom Mrs. Ertz had leased it, and demanded the rents; Dicks agreed to account to her for rents and purchased the landowner's share of the oats that had been raised that year on the farm, and agreed to lease the premises from Mrs. Ford for the next year. Afterwards Dicks repudiated this arrangement and threatened to hold possession under the old lease. Mrs. Ford then commenced an action to obtain possession under the statute relating to forcible entry and detainer. An appeal to the district court was taken from the judgment rendered in that action. Pending the trial of that appeal the case was settled, and Mr. Dicks took a lease from Mrs. Ford for one year. Mrs. Ford

has been in possession herself ever since the expiration of that lease.

On September 23, 1901, Mrs. Jinkiaway made and delivered to A. T. Ford, husband of the defendant Bertha Ardella, a deed purporting to remise, release and quitclaim the land to Mrs. Ford for a consideration of one dollar.  It appears that $5 was the amount paid, but there was evidence tending to prove that $50 was promised, although the evidence on this matter is conflicting.  The action in forcible entry and detainer was commenced in November, 1901, after the quitclaim deed had been obtained, and in her affidavit in that action Mrs. Ford stated "That on or about the 23d day of September, 1901, said plaintiff became the owner" of this land.  It will be observed that the date thus given in the affidavit is the date of the quitclaim deed.

In the original petition it was expressly alleged that Mrs. Ford took possession under her tax deed, but concealed the fact, and these allegations were repeated in different parts of the petition, making concealment one of the grounds for setting aside the tax deed.  These allegations were repeated in effect, although not so directly and emphatically, in the amended petition upon which the case was tried.  In this amended petition it was alleged, in connection with the charge of concealment and a promise of the Fords to pay the taxes, that Mrs. Ford and her husband "were at that time actually in possession of said land, having long before ousted plaintiff's tenant, and were claiming to own the same under the tax deed."

Two of the plaintiffs were minors, and an offer was made in their behalf to redeem from the tax sales by paying the necessary amounts, which the court was asked to ascertain for that purpose.

No special findings were requested.  The court found for the defendant Bertha Ardella Ford on her counterclaim to quiet title, and against all the other parties

plaintiff and defendant, except the two minors, and dismissed the cause as to them without prejudice. Judgment was rendered in favor of Mrs. Ford quieting her title as prayed for.

The principal legal questions to be considered are: *First,* Can one of several remaindermen who has no right of possession lawfully purchase and hold a tax title while the owner of the life estate is in possession enjoying the rents and profits? *Second,* Where a remainderman has purchased the land at a tax sale and obtained a tax deed valid upon its face and taken possession of the land, will a quitclaim deed taken from the owner of the life estate impair or affect her rights under the tax deed? *Third,* Does the remainderman hold the property under the tax deed for the benefit of all the remaindermen, subject to their contribution of an equitable proportion of the expense?

Proceeding in the order of the questions as stated above, it should be remembered that the title acquired under a tax deed is an independent one vesting in the grantee an estate in fee simple which extinguishes all former rights and titles of individuals. (*Board of Regents v. Linscott,* 30 Kan. 240, 265, 1 Pac. 81; *Belz v. Bird,* 31 Kan. 139, 141, 1 Pac. 246.) A person who is under an obligation to pay the tax upon land can not legally acquire and hold a valid tax title upon it. (*Keith v. Keith,* 26 Kan. 26; *Phipps v. Phipps,* 39 Kan. 495, 501, 18 Pac. 707; *Delashmutt v. Parrent,* 39 Kan. 548, 556, 18 Pac. 712.) The correlative rule that ordinarily one who is under no such obligation may do so is just as firmly established. (*Waterson v. Devoe,* 18 Kan. 223; *Nagel v. Tieperman,* 74 Kan. 32, 85 Pac. 941; *Baldwin v. Gibson,* 85 Kan. 267, 116 Pac. 827; Note, 75 Am. St. Rep. 229, 230.) In the Nagel case it was held that a wife, not being in possession or receiving rents, and under no other obligation to pay taxes, might acquire a tax title upon her husband's lands. It is also well settled that as between a remainderman and a life tenant the

latter should pay the taxes, and that the remainder-man in the absence of some agreement or controlling equity is under no obligation to do so. (*Menger v. Carruthers*, 57 Kan. 425, 428, 46 Pac. 712; 16 Cyc. 632.)

Applying these principles, it seems clear that as between the life tenant, Mrs. Jinkiaway, whose duty it was to pay the taxes, and Mrs. Ford, holding only as a remainderman, chargeable with no such duty, the tax title is valid so far as the ability of the grantee to acquire it at the time it was purchased is concerned.

Proceeding further in the order suggested above, the next proposition to be considered is the effect of the quitclaim deed upon the tax title. The contention of the parties claiming adversely to the tax title is that the immediate effect of taking the conveyance of the life estate was the payment of the taxes covered by the tax deed. This effect is claimed on the ground that the life tenant could not acquire and hold a tax title in the circumstances, and that by accepting the conveyance from her Mrs. Ford took upon herself the same burden. That is, that if Mrs. Jinkiaway had purchased the land and taken the tax deed the trans-action would have been treated as a payment of the taxes, and that one holding under her is subject to the same disability. It has been held, however, that a person rightfully holding a tax deed valid upon its face who buys an outstanding title does not thereby necessarily as a matter of law relinquish his tax deed as a muniment of title. It was decided in *Carson v. Fulbright*, 80 Kan. 624, 103 Pac. 139:

"One who is not under any obligation to pay taxes upon land, nor in privity with one so liable, may obtain a tax title thereto, and when in possession and claim-ing title under such a tax deed, apparently valid, may accept a conveyance from the former owner without incurring thereby the risk of losing his land for failure to pay a mortgage given by such former owner and outstanding when the taxes became delinquent, al-

though the mortgagor had covenanted in the mortgage to pay the taxes." (Syl.)

It was said in the opinion:

"When the taxes upon which the deed was issued became delinquent, and at the time the deed was issued, the defendant was under no obligation to pay the taxes, and by accepting a conveyance *afterward* from the former owner he did not devest himself of his previously acquired title, although such former owner was bound to pay the taxes. Such an effect can not be claimed under the operation of the rule of merger, for merger is very largely a question of intention, and will not be presumed when it would operate to the disadvantage of the party. . . . It will be presumed that the conveyance was obtained for some benefit and not for a burden." (p. 625.)

These principles apply perhaps with greater force here where the outstanding interest was a life estate only. Taking the quitclaim deed can not be construed to merge the tax title without doing violence to the Carson decision, with which the court remains content. The appellants, however, distinguish that case by referring to the fact that the tax deed there under consideration had been of record for over five years, and therefore was not assailable for defects not apparent upon its face, while here the tax deed is vulnerable to such an attack. In this situation it is argued that it was the duty of Mrs. Jinkiaway to bring a suit to set it aside, and that this duty passed to Mrs. Ford by her acceptance of the quitclaim deed. The proposition is that in buying an interest, presumably for her benefit, she imposed upon herself the duty to destroy the title which she already possessed. This presents again the question of merger. Starting with the premise that Mrs. Ford, having at the time she purchased the tax title capacity to do so and had acquired a certain interest in the land, the question is whether that interest was merged in the life estate by taking the quitclaim deed. Merger would not depend on the extent of the interest, whether a fee

simple, or one that would ripen into a fee by efflux of time. Being, as stated in the Carson case, and others cited in that opinion, largely a question of intention, we are constrained to hold that it can not be presumed, in the absence of an agreement, express or implied, to do so, that in taking the conveyance of the life estate it was the intention to destroy the tax title, the latter upon its face appearing to create an estate in fee simple. (Gen. Stat. 1909, § 9479.)

The appellants construe the effect of the quitclaim deed as creating a trust *ex malificio* in the grantee for their benefit. This effect is claimed because of alleged fraudulent representations and concealment in procuring it. The claim was made in the petition, and some evidence was offered supporting it, that the deed was obtained upon the representations that the land was about to be sold for taxes and would be lost to all parties if they were not paid; that Mrs. Ford would pay the taxes if the deed were made, and hold the land for the benefit of the parties in interest. The evidence, however, only presented a question of fact, which in view of the general finding against the appellants and in favor of Mrs. Ford must be construed as finding that the contention was not true. The weight of the evidence and credence to be given to it were for the trial court. If a special finding had been desired on that particular issue a request for it should have been made. Any consideration here of the legal effect of such representations would be unwarranted in view of the findings. In this connection it may be said that the refusal of the court to allow Mrs. Jinkiaway to testify whether she would have made the conveyance had she known that Mrs. Ford was then claiming the property under a tax deed, is regarded as immaterial, although an answer might well have been allowed. For the purpose of this ruling a negative answer will be presumed. The finding of the court sufficiently indicates that such an answer would not have affected the decision. Errors not prejudicial must under the mandate

of the code, and in pursuance of good practice, be disregarded.

We come now to the third question, whether Mrs. Ford in the attitude of a remainderman rightfully holding a tax title holds it for the common benefit of all the remaindermen, that is, whether that is the legal effect of her purchase. This question is important to all the parties except Mrs. Jinkiaway and one of the appellants who has conveyed his interest to Mrs. Ford. It should be observed that her coremaindermen, or as they have sometimes been called, cotenants in remainder, are not tenants in common as that term is ordinarily applied, possession, or a common right of possession, being essential to tenancy in common. The remaindermen hold from the same common source, that is, under the will, but independently of each other. One tenant in common may not hold a tax title against his cotenants, for by virtue of the common possession he is equally bound with his cotenants to pay the taxes (*Muthersbaugh v. Burke*, 33 Kan. 260, 6 Pac. 252), and for the same reason redemption by one is effectual for all. Not so with coremaindermen. They have no common possession or possession of any sort from which such consequences may flow.

The rights and obligations of life tenants and remaindermen as holders of tax titles were considered in a highly instructive opinion of the supreme court of Iowa. The principles decided, so far as they relate to this controversy, may be stated without reciting the facts of that case. It was held that remaindermen who are not in possession and have no right of possession at the time of the sale may purchase and hold an outstanding tax title for their exclusive benefit against other remaindermen, but that the purchase of a tax title by a tenant for life in possession does not vest the title in him as against remaindermen, but operates as a redemption from the tax sale. It will be noticed that the first point decided answers the question now under consideration. The court said on that proposition:

"Here, however, the cotenants in remainder were not

in possession, nor did they have any right of possession, and they were not chargeable with the duty and responsibility of making payment of taxes. As between themselves, it can not be said that there were any reciprocal rights or duties. The duty of paying taxes rested upon the life tenants, and, should one of the remaindermen have seen fit to pay taxes allowed to become delinquent for the protection of the estate, he could not recover any portion of the amount so paid from his coremaindermen. There being no duty to pay, there could be no such thing as an enforced contribution." (*Crawford v. Meis,* 123 Iowa, 610, 99 N. W. 186, 66 L. R. A. 154, 101 Am. St. Rep. 337.)

Brief reference will now be made to a few of the cases relied upon by the appellants as supporting a contrary view. It was held in *Clark v. Lindsey,* 47 Ohio St. 437, 25 N. E. 422, 9 L. R. A. 740, that where a tenant in dower neglects to pay taxes and one of several tenants in common in remainder purchases the land at a tax sale, the purchase will inure to the benefit of his cotenants in remainder. The opinion, however, refers to an Ohio statute providing that when a tenant in dower shall neglect to pay taxes so long that the lands are sold for their payment, and there is no redemption in one year, the tenant in dower shall forfeit that estate to the remainderman or reversioner, who may thereupon redeem as other lands are redeemed. A doweress having failed to pay taxes as this statute provided, two of the remaindermen purchased at tax sale. On the question whether another remainderman was devested of his estate by the tax title the court said:

"In our view, the relations existing between tenants in common—whether in possession of the property or entitled to an estate in remainder—is of a nature to preclude such a result. Just dealing and the confidence necessarily reposed in each other would suggest, that owners in common of real estate should consult for the mutual benefit. While one should do no act intentionally to the detriment of the other, good faith should withhold him from all action, in reference to the com-

mon property, that would work exclusively to his own advantage." (p. 441.)

It will be seen that the Ohio court places remaindermen, with respect to each other, on the same footing as tenants in common in purchasing tax titles. It does not clearly appear what weight was given to the statute referred to in arriving at the result.

Mississippi decisions are cited by the appellant to sustain the view taken by the Ohio court that remaindermen are to be treated as tenants in common in respect to the purchase of tax titles. In *Harrison v. Harrison*, 56 Miss. 174, it was held that a remainderman who purchased an outstanding tax title arising out of the failure of the life tenant to pay the taxes held it in trust for his cotenant in remainder. In a luminous note in 33 L. R. A. 688, upon the effect of a tax sale on land held by a life tenant, it is said that under the decisions of Kansas and other states named the tax sale extinguishes all prior titles of every kind, while in other states the sale is limited to the life estate. Mississippi is classified with the latter.

In *Defreese v. Lake,* 109 Mich. 415, 67 N. W. 505, 63 Am. St. Rep. 584, 32 L. R. A. 744, it appears that land was devised to a wife for life, then to a son for his life, with remainder to the heirs of the son. Taxes being delinquent during the life of the widow, the land was sold at tax sale to the son. After the widow died, the son took possession, and after two years conveyed the land to Lake. After the son's death, his heirs claimed the lands as remaindermen, and Defreese claimed under them. That is, one party claimed through conveyances from the son, and the other through conveyances from his heirs. When the son owning the life estate died his heirs could not hold the property otherwise than under the tax deed which he had taken while his mother, the first life tenant, was in possesson. The court said:

"We have found no case upon all fours with this, and

we doubt if it can be said that the law imposes any such duty [to pay the taxes] upon the second life tenant, during the tenancy of his predecessor. But we think it does not necessarily turn upon a duty to pay. While he was under no obligation to preserve the estate, if he chose to do so that he might reap the benefit of the devise, he should be content to look to the occupant, whose duty it was to pay them, for reimbursement, or, if not, he could expect no more than contribution from the other remaindermen, to whose benefit, as well as his own, such payment inured. It would be inequitable to permit him to claim title under such circumstances, where he took under the same will that gave them an estate, thereby recognizing their right. Good faith toward the testator should forbid such an attempt to defeat his purpose. Were this claim to be sustained, it would make it easy for two life tenants, by collusion, to defeat the remaindermen, under circumstances like these." (p. 427.)

The distinguishing feature of the Defreese case appears to be the fact that there were two successive life estates. The question presented did not relate to the duty of the son to coremaindermen, but to the owners of the succeeding life tenancy created by the same will. The opinion refers to the earlier case of *Blackwood v. Van Vleit*, 30 Mich. 118, where the same court had said:

"To preclude any person from making and relying upon a purchase of lands at tax sale, there must be something in the circumstances of the case which imposes upon him a duty to the state to pay the tax, or something which renders it inequitable, as between himself and the holder of the existing title, that he should make the purchase. . . . While a party is not to build up a title on his own neglect of duty, yet if he can show he owes no duty in the premises, he is as free to become purchaser at a tax sale as any other person." (pp. 121, 123.)

In the Defreese case the court also said:

"In *Sands v. Davis,* 40 Mich. 14, the question arose between tenants in common. In that case one bought

a tax title that was outstanding at the time of the purchase of his interest in the premises, and therefore which he owed no duty, to the state or his cotenants, to pay, and it was held that he might set up such title against his cotenants. Both of these cases recognize the proposition that one asserting a tax title may be under a disability, owing to his relations to others claiming interests in the land." (p. 428.)

Thus it appears that notwithstanding the decision in the Defreese case the court still adhered to the principle that one may assert a tax title who owes no duty to pay the tax.

In Freeman on Cotenancy and Partition the general rule is stated that a cotenant will not be permitted to assert against his companion a title founded upon taxes imposed on the common property, adding, however:

"But where the purchasing cotenant has paid his taxes, and is therefore free from fault, and *there is nothing in the relations between the parties imposing any obligation on either to pay the charge upon* the moiety of the other, then it is difficult to assign any reason for restraining the tenant not in default from bidding for his own use at the tax sale." (§ 158.)

The part we have italicised in the above quotation appears to be in harmony with the proposition that the disability is consequent upon the obligation, and this, notwithstanding the apparent contrariety in decisions, is the controlling principle, which is tersely stated in *Crawford v. Meis*, 123 Iowa, 610, 99 N. W. 186:

"It is true, as contended for by counsel for appellants, that where there exists, as between joint tenants or tenants in common, a reciprocal duty of protecting the joint estate, one may not absorb or get rid of the interest of his cotenant by allowing the property to go to tax sale, and thereunder acquire title to the entire estate through the medium of a tax deed. . . . It is to be noted, however, that in each of the cases cited, and in others where the like rule is declared, the cotenants were in possession or entitled to possession, and each was charged with the duty of protecting the joint estate. And it is under such circumstances that payment by one cotenant is held to be presumably for

the benefit of all, and he who pays may charge the several interests of his cotenants with the proportionate parts which such cotenants should have paid. (Cooley on Taxation, 467.) The reason for the rule seems to be that, there being a reciprocal duty on the part of the cotenants to pay the taxes assessed, and as a part of the taxes for which the land is sold is a claim upon the purchaser's share, the sale is based in part upon his own default." (p. 614.)

It is not deemed necessary to refer further to cases relied upon by the appellants. Following the principle which we believe to be the logical deduction from our own decisions, and the weight of the reasoning in the opinions of other courts, it is held that because there was no obligation or duty at the time Mrs. Ford purchased the tax title she could assert it not only against the life tenant but against the other owners of the estate in remainder.

Two incidental questions remain to be considered. The appellants earnestly and forcibly argue that notwithstanding the averments of the petition to the effect that Mrs. Ford was in possession under her tax deed before she obtained the quitclaim deed, the proceedings in forcible entry and detainer and her affidavit there filed estop her from asserting that she had such previous possession, or conclusively prove that she did not. On the other hand, Mrs. Ford contends that the appellants are estopped by their pleading to deny that she had such prior possession. But the evidence tended to prove that the subtenant attorned to her. If that was the fact her possession under the tax deed was sufficiently shown. (*Sheaff v. Husted,* 60 Kan. 770, 57 Pac. 976.) A subsequent action to obtain possession caused by a repudiation of the agreement by the occupant would not be inconsistent with previous possession. The affidavit contained evidence tending to show a reliance upon the quitclaim deed, but was not conclusive. The time when possession was taken was a fact to be determined on the pleadings and all the evidence.

The district court by dismissing the case against the minors remitted them to their right of redemption in the manner provided by statute. (Gen. Stat. 1909, § 9466.) As the remedy there provided is simple, involving only a computation by the proper authorities and payment of the proportionate sum by the redemptioner, no reason appears for resorting to a court of equity. If the statutory right had been denied or there had been a substantial disagreement over the amount, or other ground for resorting to the court, such action might have been upheld. The rights of the minors were fully protected and they have no just ground of complaint.

The judgment is affirmed.